UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIELLE ARTHUR,

    Plaintiff,

v.

NOLAN VANDERWEELE, et al.,

    Defendants.

_____/

Case No. 1:24-cv-105

Hon. Hala Y. Jarbou

## **OPINION**

Danielle Arthur was a mental-health practitioner at the Oaks Correctional Facility, a prison operated by the Michigan Department of Corrections (MDOC). In April 2023, assistant deputy warden Douglas Krause asked Arthur to participate in a hostage-rescue training in which she played the hostage and he the hostage-taker. During their simulated rescue of Arthur, two corrections officers participating in the exercise, Nolan VanderWeele[1] and Nicholas Wemple, rushed at Krause and knocked him into a filing cabinet. Arthur, who was standing next to Krause, fell against an armchair and was momentarily pinned to it. Arthur left her job at the prison the following month, and she eventually sued Krause, VanderWeele, Wemple, and other participants in the exercise for allegedly using excessive force against her during the training. VanderWeele and Wemple, the sole remaining defendants, now move for summary judgment. Because there is no genuine dispute that Arthur was not the target of Defendants' intentional conduct, Arthur was

---

[1] The parties agree that VanderWeele's name is misspelled in the case caption and on the docket. The Court will order the clerk to correct the spelling of VanderWeele's name in both records. *See Waggoner v. City of Battle Creek*, No. 1:12-cv-827, 2013 WL 1591793, at *4 (W.D. Mich. Apr. 10, 2013).

not "seized" within the meaning of the Fourth Amendment, and her excessive-force claim fails. The Court will therefore enter summary judgment in Defendants' favor.

## I. BACKGROUND

### A. The Training Exercise

Danielle Arthur began working as a qualified mental-health professional at Oaks Correctional Facility in June 2022. (Arthur Dep. 16, ECF No. 113-3.) Arthur secured the position through a staffing agency, which was her formal employer. (*Id.* at 14.) On April 18, 2023, Krause directed Arthur and her supervisor Brian Majerczyk to participate in a training exercise. Krause told Arthur to report to Majerczyk's office, where he would pretend to take her hostage. (*Id.* at 18.) When Arthur got to Majerczyk's office, Krause instructed the two to depress the alert buttons on their personal-protection devices, which prison staff carry so they can request assistance during dangerous situations. (*See* Arthur Dep. 22; Investigative Record, ECF No. 113-2, PageID.893.)[2] Krause, playing the role of the hostage-taker, then conducted "negotiations" with corrections officer Jared Revolt and acting lieutenant Travis Hall for the release of Arthur and Majerczyk. (Ison Dep. 16–17, ECF No. 113-8.)

Within approximately fifteen minutes of the negotiation portion of the exercise commencing, the officers playing the rescue squad arrived outside Majerczyk's office. (Revolt Dep. 17–18, ECF No. 113-7.) During the negotiations, Krause picked a highlighter out of a pen holder on Majerczyk's desk and guided Arthur to stand in front of him. (*See* Krause Dep. 17, ECF No. 113-4.) Krause then put the highlighter to Arthur's throat and walked her to a window, illustrating to the officers playing the rescuers that Arthur's life was under threat. (Arthur Dep.

---

[2] The reports on MDOC's investigation into Arthur's injury, discussed below, are admissible as public records under Federal Rule of Evidence 803(8)(A)(iii).  See *Gregg v. Ohio Dep't of Youth Servs.*, 661 F. Supp. 2d 842, 850 (S.D. Ohio 2009).

24–25.) Shortly thereafter, Krause told the rescuers that Arthur was having a diabetic incident and that he would let Majerczyk go. (Investigative Record, PageID.894, 908.) Just outside the door, four of the corrections officers playing rescuers began forming up to rush into the room. Nolan VanderWeele, armed with a shield, was the point man. Behind him were Nicholas Wemple, Connor Ison, and John Farago. (Ison Dep. 18.) The four officers were wearing Department of Corrections–issue cell extraction gear. (Ison Dep. 17; ECF No. 113-14, PageID.1220.)

Inside the room, Krause told Majerczyk to get ready to leave. He then arranged himself and Arthur within the confines of Majerczyk's office. A short filing cabinet with armchairs on either side stood along the wall opposite the door to the office. (Investigative Record, PageID.697; *see* Wemple Dep. 83, ECF No. 113-9.) Krause stood in front of this filing cabinet and positioned Arthur to his right, placing her near the armchair to the left of the cabinet. (Arthur Dep. 25.) The chair was less than three feet from the edge of Majerczyk's desk, which ran perpendicular to it. (Investigative Record, PageID.697.) Krause then told Majerczyk to leave the room. (*Id.*, PageID.550.)

When Majerczyk opened the door, VanderWeele, leading with his shield, marched into the room at about half the speed he would have used in a real hostage incident. (VanderWeele Dep. 20–21, ECF No. 113-12; *see* Arthur Dep. 47.) Simultaneously with VanderWeele's entry into the room, Wemple stepped around VanderWeele's left flank and crouched low to secure Krause's legs. (Wemple Dep. 84.) According to Krause, as VanderWeele barreled into the room toward him, Krause nudged Arthur out of the trajectory of the shield. (Krause Dep. 19.) This resulted in Arthur being pushed around two feet to the left, putting her right in front of the armchair (Krause Dep. 19) and Wemple (Wemple Dep. 83). VanderWeele then rammed Krause. (Wemple Dep. 71–72, 81; VanderWeele Dep. 21–22.) VanderWeele testified that he pushed Krause "with the entirety of the shield" (VanderWeele Dep. 23).

What happened next is the core dispute in this case. According to Krause's recounting of events to the MDOC investigator, the momentum of the squad knocking into him resulted in Arthur being pushed into the armchair. (Investigative Record, PageID.551.) At his deposition, Krause testified that he walked about three feet backwards into the filing cabinet and "guided" Arthur into the armchair next to him. (Krause Dep. 18–19.) At the same time, Wemple grabbed Krause's right knee with both hands (Wemple Dep. 83) and slid in around Krause's legs (*id.* at 90).

Krause did not believe that VanderWeele's shield impacted Arthur (*id.*), and VanderWeele outright denied it in his deposition (VanderWeele Dep. 23–24). Wemple also denied ever coming into contact with Arthur, notwithstanding his proximity to her and the cramped confines of Majerczyk's office. (Wemple Dep. 83–84.) Wemple told the MDOC investigator that once he got hold of Krause's right leg, Krause could not step back and was forced to lean into Arthur. (Investigative Record, PageID.520.) Arthur was then forced in turn to lean onto the armchair. (*Id.*) Wemple also described Arthur as appearing to "move or evade back from the contact over the arm of a chair." (*Id.*, PageID.949.) Wemple testified that he could not "see any other way" for Arthur to have gotten hurt than through direct contact with VanderWeele's shield or being jostled by Krause as he staggered back from VanderWeele's charge. (Wemple Dep. 72.) Wemple's account is corroborated by Majerczyk, who told the MDOC investigator that Krause "was still holding on to" Arthur when the rescuers barreled into him, tripping the two of them into the chair and resulting in some of the squad members falling "slightly" on both of them. (Investigative Record, PageID.419–420). This is also the version of events that made it into the prison's official report on the incident, which said that Krause was "push[ed] . . . back" into Arthur. (*Id.*, PageID.908.)

4

For her part, Arthur testified that she could recall nothing between the hostage rescuers bursting through the door and then finding her left leg pinned against the left armchair and in great pain. (Arthur Dep. 39.)  In the report Arthur filed on the day of the incident, Arthur said that her "leg got pinned" when the officers rushed in and that the "weight of the officer" put "pressure" on her leg. (Investigative Record, PageID.911.)  And in response to a questionnaire by the MDOC investigator, she said that "forceful pressure on [her] leg above [her] left knee" pinned her to the armchair and caused her leg to twist. (*Id.*, PageID.883.)  But in no description of the incident does Arthur provide a precise account of how she ended up against the chair.

The pain of having her upper leg pinned against an armchair caused Arthur to cry out. According to Majerczyk, who was standing just outside of his office, Arthur yelled "Ow, fuck, you're on my leg!" (*Id.*, PageID.927.)  Krause testified that Arthur "hollered ouch." (Krause Dep. 28.)  After Arthur cried out, she recalled the pressure pinning her to the chair being relaxed. (Arthur Dep. 41.)  Krause testified that he called an end to the exercise when Arthur gave voice to her distress. (Krause Dep. 28; *see* Investigative Record, PageID.908.)  Arthur agreed that the exercise ended after she was injured. (Arthur Dep. 48–49.)

**B.    The Aftermath**

Arthur was left stunned and injured by the hostage training.  She testified that when she shook off her confusion, she found herself sitting in the chair with the other participants in the exercise staring at her. (Arthur Dep. 26.)  She felt humiliated by the experience and struggled to contain her emotions. (*Id.*)  Arthur left for the day after submitting a report detailing what happened during the hostage exercise. (*Id.*, PageID.769; Arthur Dep. 49.)

An MRI scan on May 5 revealed that Arthur sustained a mild knee sprain and an incomplete impaction fracture on the inside bones of her left knee during the exercise. (*Id.*, PageID.795.)  On May 10, while conducting her rounds, Arthur spoke with corrections officer Edmund Stone, who

5

asked if her slow gait and limp were the result of "the common peroneal." (*Id.*, PageID.786.) Arthur asked what the phrase meant, and Stone explained that it referred to a blow to the upper leg whose purpose is to drop the target of the blow to the ground. (*Id.*) Stone recounted overhearing other corrections officers attributing the injury Arthur sustained during the training exercise to a misdirected strike aimed at another participant. (*Id.*; Stone Dep. 14) Stone admitted to the MDOC investigator that he did not participate in the hostage training and did not personally witness anyone strike Arthur. (Investigative Record, PageID.979.) Both Krause and Wemple testified that a common peroneal strike could not have been inflicted on her because of the arrangement of furniture and the limited space in the room. (Krause Dep. 22; Wemple Dep. 71.) Majerczyk similarly denied seeing anyone strike Arthur when interviewed by the MDOC investigator, instead reporting that he "observed people leaning on each other because they fell into a chair." (Investigative Record, PageID.887.)

Arthur did not return to work at Oaks after May 17. (ECF No. 113-11, PageID.1129.) On August 21, with no date for Arthur's return on the horizon, the prison decided to backfill her position, leaving her without a job. (*Id.*, PageID.778.) Before her termination, the prison administration launched an internal investigation into whether any MDOC policy was violated during the hostage exercise. (*Id.*, PageID.882.) The investigation was assigned to Bill Rushford, an inspector at another MDOC facility. (*Id.*, PageID.880.) Rushford submitted the report of his investigation into Arthur's injury on October 11. The report found that because Arthur had not reported receiving a strike or another form of intentional conduct that caused her injury, there was "insufficient evidence . . . of any inappropriate physical contact." (*Id.*, PageID.906.) The overheard conversation that Stone passed on to Arthur was dismissed as unverified hearsay. Rushford concluded that the momentum of the entry of the squad playing hostage rescuers "caused

6

any accidental contact that may have occurred." (*Id.*) The investigation was reopened on March 11, 2024, to collect additional evidence. (*Id.*, PageID.549.) But Rushford reached the same conclusion he did originally: Arthur's injury was an accident. (*Id.*, PageID.556.)

### C. Procedural History

Arthur initiated this lawsuit on February 2, 2024, naming Krause and the corrections officers involved in the hostage exercise as defendants. (ECF No. 1.) Subsequent amendments of the complaint and orders by this Court have whittled the case down to its present dimensions: Arthur alleges that VanderWeele and Wemple used excessive force against her in violation of the Fourth Amendment. Before the Court is VanderWeele and Wemple's motion for summary judgment (ECF No. 112).

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249 (citing *First Nat'l Bank of Ariz v. City Serve. Co.*, 391 U.S. 253, 288-89 (1961)). Summary judgment is not an opportunity for the Court to resolve factual disputes. *Id.* The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

## III. ANALYSIS

The Fourth Amendment prohibits the government from conducting "unreasonable searches and seizures." The threshold issue for any Fourth Amendment claim, then, is whether the

challenged government conduct can be characterized as a search or seizure. Since Arthur does not contend that Defendants searched her, the analysis in this case can be confined to seizure.

### A.      Seizure

"A seizure can occur in one of two ways: (1) use of force with the intent to restrain; or (2) show of authority with acquisition of control." *Campbell v. Cheatham Cnty. Sheriff's Dep't*, 47 F.4th 468, 476 (6th Cir. 2022) (citing *Torres v. Madrid*, 592 U.S. 306, 317 (2021)). Common to both forms of seizure is the necessity of intent. The Fourth Amendment "addresses 'misuse of power,' not the accidental effects of otherwise lawful government conduct." *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989) (citation omitted) (quoting *Byars v. United States*, 273 U.S. 28, 33 (1927)). "[F]or a seizure to occur, the detention or taking must be willful; seizure cannot be applied to an unknowing act." *Stewart v. City of Middletown*, 136 F. App'x 881, 883 (6th Cir. 2005) (citation omitted).

That one who is not the target of an officer's intentional conduct has not been seized within the meaning of the Fourth Amendment is most evident with respect to seizures by control. Acquisition of control, whether accomplished through "voluntary submission to a show of authority or the termination of freedom of movement," *Torres v. Madrid*, 592 U.S. 306, 322 (2021), is measured according to whether the officer's conduct "conveyed to the person confronted" that they were not "free to ignore the police presence and go about [their] business," *Brendlin v. California*, 551 U.S. 249, 261 (2007) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 575 n.7 (1988)). The classic examples of a display of authority—a "threatening presence," a "display[ed] weapon," a "physical touch[]," a peremptory "tone of voice," *see United States v. Mendenhall*, 446 U.S. 544, 554 (1980)—are all purposive; they aim to bring about compliance with the officer's directives by those to whom they are addressed. Although "'an unintended person may be the object of the detention' caused by an intentional show of authority," only one who reasonably "perceive[s] that the show of authority was at least partly directed at him" can

8

contend that they were seized. *United States v. Cloud*, 994 F.3d 233, 243 (4th Cir. 2021) (quoting *Brendlin*, 551 U.S. at 254).

*Ewolski v. City of Brunswick*, 287 F.3d 492 (6th Cir. 2002), is on point. At issue in *Ewolski* was whether a Fourth Amendment claim would lie against officers who allegedly used excessive force in attempting to subdue a mentally ill man who took his son and wife hostage and shot at officers who attempted to rescue them. *Id.* at 498–99, 505. The Sixth Circuit held that the hostage-taker, but not his family members, had been seized. Although the hostage-taker did not submit to the police's show of authority, because "the police surrounded the house and paraded an armored vehicle in front" of it, the police's "actions qualif[ied] as an intentional application of physical force and show of authority made with the intent of acquiring physical control." *Id.* One whose liberty of movement is successfully restrained by officers' intentional conduct is seized, even if the police never take them into formal custody. By contrast, the hostage-taker's wife and son were not seized because the officers' control over the family members' environment did not constrain their "freedom to walk away." *Id.* at 507. The officers gave the family members no reason to believe that they were barred from leaving the house, and their "clear objective" was to liberate them from the man holding them hostage. *Id.* Absent an exercise of control "that somehow restricts the subject's physical liberty," the court held, "[c]ontrol over one's environment does not establish a seizure." *Id.*

Intent is no less necessary for seizures accomplished through force. Only one who is the "deliberate object" of an officer's "exertion of force" has been seized within the meaning of the Fourth Amendment. *Fisher v. City of Memphis*, 234 F.3d 312, 318 (6th Cir. 2000) (quoting *Claybrook v. Birchwell*, 199 F.3d 350, 359 (6th Cir. 2000)). Neither "[a]ccidental force" nor "force intentionally applied for some other purpose" suffices. *Torres*, 592 U.S. at 317. The leading case

in this circuit is *Claybrook v. Birchwell*, in which the force at issue was the shooting of an innocent bystander sitting inside a vehicle caught in an exchange of fire between police officers and the bystander's father-in-law. 199 F.3d 350, 354–55 (6th Cir. 2000). Drawing on Supreme Court precedent, *Claybrook* held that the bystander's claim was properly recognized under the Fourteenth Amendment's Due Process Clause rather than the Fourth Amendment. Because officers cannot "'seize' any person other than one who was a deliberate object of their exertion of force," harms "inadvertently inflicted upon an innocent third party" stemming from a privileged use of force "are adjudged according to substantive due process norms," which subject officers to liability only if their conduct "shocks the conscience." *Id.* at 359 (emphasis omitted) (first citing *Brower*, 489 U.S. at 596; then citing *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).[3] Nor is the Sixth Circuit alone in this respect: "the unanimous approach of the courts of appeals" is to bar "bystanders harmed by state force" from contending that the use of force against them effectuated their seizure. *Napper v. Hankison*, 617 F. Supp. 3d 703, 740 & n.20 (W.D. Ky. 2022); *see also Rodriguez v. County of Los Angeles*, 654 F. Supp. 3d 1029, 1046 (C.D. Cal. 2023) (collecting cases).

To be sure, only objective expressions of an officer's intent are relevant to characterizing their conduct as a seizure. A misapprehension by the target of an unreasonable display of authority, for example, about whether the person making the display was a law-enforcement officer will not insulate the officer from liability if a reasonable observer would have recognized that the officer was acting under color of law. *See Campbell*, 47 F.4th at 479 & n.5. It is also true that officers can be held liable for the unwanted results of intentional conduct. An officer's mistake about the

---

[3] This Court previously dismissed Arthur's Fourteenth Amendment claim. (ECF No. 80 at 9.) Because Arthur does not seriously argue that either Defendant's conduct amounted to a deprivation of due process (*cf.* Resp. 32), the Court will not address the issue.

identity of an arrestee does not render their arrest of that person any less intentional. *See Brower*, 489 U.S. at 596 (citing *Hill v. California*, 401 U.S. 797, 802–5 (1971)). Nor does the desire to question only the driver of a vehicle negate the restriction on the passenger's freedom of movement when the vehicle is pulled over. *See Brendlin*, 551 U.S. at 261.

But although an officer's liability is not based on their subjective motives, and despite the fact that intent is inferred from the officer's behavior, an officer cannot intend to seize a person at whom the officer's intentional conduct is not directed. The term "seizure" by definition "connote[s] an intentional interference with a person's liberty." *Peete v. Metro. Gov't of Nashville & Davidson Cnty.*, 486 F.3d 217, 220 (6th Cir. 2007). An officer must "'*objectively* manifest[] an intent to restrain' the liberty of an individual" for their conduct to constitute a seizure. *United States v. Wright*, 57 F.4th 524, 530 (5th Cir. 2023) (quoting *Torres*, 141 S. Ct. at 998); *see also Quinn v. Zerkle*, 111 F.4th 281, 297 (4th Cir. 2024) (explaining difference between analyzing whether officer "at all intended to seize or use excessive force" and "consider[ing] an officer's underlying motive or intent").[4]

That only an officer's intended target is seized does not limit the Fourth Amendment's protections to situations in which a single individual is targeted. In *Fisher*, the defendant violated the Fourth Amendment by unlawfully seizing the plaintiff, who was a passenger in a car that the defendant shot at to bring it to a halt. The court held that the defendant could be held liable to the passenger because the car "was the intended target of Defendant's intentionally applied exertion

---

[4] A Sixth Circuit panel held that *Brower* and *Brendlin* entail that "an unintentional victim is protected under the Fourth Amendment." *Kilnapp v. City of Cleveland*, No. 22-4059, 2023 WL 4678994, at *4 (6th Cir. July 21, 2023). *Kilnapp* is not binding on the Court, which must adhere to circuit precedent unless overruled by the Sixth Circuit sitting en banc or the Supreme Court. *See In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 476 (6th Cir. 2014). And *Killnap*'s interpretation of *Brower* and *Brendlin* is contested. *See Irish*, 108 F.4th at 719–20 (denying that *Brendlin* and *Torres* "end[ed] any 'debate' on subjective intent's role in whether a seizure occurred); *Singleton v. Casanova*, No. 22-50327, 2024 WL 2891900, at *16 (5th Cir. June 10, 2024) ("*Brower* has *not* been construed to establish an all-purpose 'transferred intent' rule for § 1983 claims asserting Fourth Amendment violations.").

of force": although the defendant was "shooting at the driver of the moving car" rather than the passenger, the defendant "intended to stop the car," so he necessarily intended to stop the passenger too. *Fisher*, 234 F.3d at 319. *Fisher* makes clear that anyone whose freedom of movement is necessarily restrained when an officer uses force against a deliberate target is also a target and cannot be seized unreasonably.

The same principle is illustrated by cases allowing Fourth Amendment claims when a police canine is released to hunt down a fleeing suspect but ends up attacking a different person. *See Rodriguez v. County of Los Angeles*, 654 F. Supp. 3d at 1047 (collecting cases). Courts adhering to this rule impute to the dog's handler the intent that it "seize anyone in the space where the dog was deployed," since the officer is charged with knowing that he cannot control who the dog will apprehend once it is unleashed. *See id.* (quoting *Rodriguez v. City of Fresno*, 819 F. Supp. 2d 937, 947 (E.D. Cal. 2011)). Although this reasoning is open to criticism, *see Looper v. Las Vegas Metro. Police Dep't*, No. 23-cv-1436, 2025 WL 2530909, at *9 (D. Nev. Sep. 2, 2025), the important point here is that the cases that rely on it do not negate the intent requirement; instead, they construe the officer as intentionally targeting all who are at risk of having their freedom of movement terminated by an uncontrolled instrumentality.[5]

The canine cases can be contrasted with those cases rejecting Fourth Amendment liability when a hostage is injured in the course of an attempt to subdue their captor. That accidental harm to a hostage does not implicate the Fourth Amendment was recognized in *Fisher* itself, which emphasized how "different" the case before it was from those in which "an officer is attempting to shoot one individual (the fleeing felon) and avoid another (the hostage)." *Id.* at 318 n.2; *see*

---

[5] Sixth Circuit precedent suggests that one attacked by a police canine that was not directed to do so by its handler "ha[s] no cognizable Fourth Amendment claim." *Whitworth v. Kling*, 90 F.4th 1215, 1218 (8th Cir. 2024) (quoting *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004)).

12

*also Rodriguez v. Passinault*, 637 F.3d 675, 686–87, 686 n.5 (6th Cir. 2011) (collecting cases). Many of the cases cited in *Napper v. Hankison*, 617 F. Supp. 3d 703, 740 (W.D. Ky. 2022), in support of the proposition that an innocent bystander cannot raise a cognizable Fourth Amendment claim are hostage cases. *See Landol-Rivera v. Cruz Cosme*, 906 F.2d 791, 795 (1st Cir. 1990); *Childress v. City of Arapaho*, 210 F.3d 1154, 1156–57 (10th Cir. 2000); *Pearce v. Doe*, 849 F. App'x 472, 475 (5th Cir. 2021). Taken together, these two lines of cases teach that determination of whether an individual has been seized depends on a careful assessment of whether restraining an individual's freedom of movement or using force against them was within the scope of an officer's (objectively ascertained) intentional conduct.

### B. Application

In light of these principles, Arthur can survive summary judgment only if she can point to a genuine dispute over whether she was the target of intentional conduct by VanderWeele or Wemple. Her inability to do so is dispositive.

First, the very nature of the hostage exercise attests that Arthur was not the intended target of Defendants' force. The undisputed facts establish that the officer in charge of the hostage-rescue team ordered the rescue team, including Defendants, to subdue Krause. (Investigative Record, PageID.904.) The rescue was initiated because Krause told the negotiator that Arthur was "experiencing a simulated diabetic episode." (*Id.*) Jared Revolt, the officer who conducted the negotiations, testified that all participants in the exercise knew that it was a training. (Revolt Dep. 18–19, ECF No. 109-7.) Wemple told the MDOC investigator that when he arrived at the building in which Majerczyk's office was located, he was directed to gear up because of a "hostage situation" and that he would be responsible for restraining the hostage-taker's lower body. (Investigative Record, PageID.888.) Wemple testified that either Revolt or VanderWeele shouted that there was a "third occupant" in the office other than Krause and Majerczyk himself, and that

13

the third person was a "psych." (Wemple Dep. 47.)  From these facts, it is evident that Defendants understood that Arthur was not the hostage-taker they were to subdue but one of the people they were to liberate.  Arthur admits that Defendants understood these features of the simulation.  (Pl.'s MSJ Resp. 4–5, ECF No. 119.)

Second, Defendants' physical behavior indicates their target was Krause.  VanderWeele testified that when he entered into Majerczyk's office, he marched into Krause with his shield at about half the speed he would use during a real hostage extraction, then took hold of Krause's shoulders.  (VanderWeele Dep. 21.)  Similarly, Wemple testified that as VanderWeele marched into the room, Wemple came around VanderWeele's side and crouched so that he could grab Krause's knee.  (Wemple Dep. 82.)  Had Arthur been the officers' intended target, they could have directed these actions against Arthur, but Arthur presented no evidence that VanderWeele ever contacted her with his shield (something VanderWeele expressly denied, *see* VanderWeele Dep. 23–24), or that Wemple grabbed her leg, even though Wemple was "directly in front of" her (Wemple Dep. 83).  Krause testified that when the hostage-rescue team entered the room, Krause started moving Arthur out of the team's way and then continued "guiding her into the chair" next to them as he received the impact of VanderWeele's shield (Krause Dep. 18–19), but there is no evidence that either Defendant altered his trajectory to track Arthur's.  All Arthur could remember was seeing the squad "rush in," not who they were rushing at.  (Arthur Dep. 26.)  These facts are sufficient to establish that Arthur was not the intended target of Defendants' force.

Further, there is no admissible evidence that either Defendant actually used force against Arthur's person.  Arthur's clearest account of how she ended up pinned against the chair suggests that when VanderWeele collided with Krause, Krause was knocked into Arthur, and that the two fell against the armchair.  Arthur was then pinned in that position because VanderWeele and

14

Wemple restrained *Krause* by grabbing hold of his shoulders and legs. (Resp. 20.) But nothing about this scenario entails that VanderWeele or Wemple ever touched Arthur, let alone that they used force to pin her to the chair. As previously noted, Krause testified that he began moving Arthur out of VanderWeele's path before VanderWeele's shield hit them. (*See* Krause Dep. 19.) Arthur points out that because VanderWeele's shield was transparent, Defendants were aware of Arthur's proximity to Krause when they charged up to him (Resp. 6). But this cuts both ways; the transparency of the shield also enabled VanderWeele to see exactly who his shield impacted. (*See* VanderWeele Dep. 21.) VanderWeele's unrebutted testimony that the did not come into contact with Arthur forecloses the inference that Arthur was propelled into the armchair by the shield. Similarly, the deliberateness involved in grabbing hold of a person's leg reinforces Wemple's unambiguous denial that he struck Arthur when he gripped Krause's knee. (Wemple Dep. 82–83.)

The only evidence Arthur can point to of any force being directed at her is the rumor she heard from corrections officer Edmund Stone that she had been the accidental target of a peroneal strike. But Stone did not report that VanderWeele or Wemple were rumored to have dealt Arthur the alleged blow. Hence, the rumor is not "evidence supporting each individual defendant's personal involvement in the alleged violation," a prerequisite for any suit brought under 42 U.S.C. § 1983. *See Pineda v. Hamilton County*, 977 F.3d 483, 491 (6th Cir. 2020) (quoting *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 291 (3d Cir. 2018)). That the rumor appears to be hearsay that Arthur cannot present in admissible form, *see* Fed. R. Civ. P. 56(c)(2), forecloses Arthur's seizure-by-force argument.

Resisting this conclusion, Arthur quotes *Fisher* for the proposition that "the intent in question is the intent to commit the act, not the intent that a certain result be achieved": even if the Defendants did not intend to restrain her, her argument goes, they obviously intended to barrel into

Krause and hold him in place. (Resp. 19–20 (citing *Fisher*, 234 F.3d at 317).) *Fisher*'s indifference to the "intent that a certain result be achieved" covers situations in which an unexpected injury befalls the target of an intentional use of force, such as the gunshot inflicted on the *Fisher* plaintiff by an officer who targeted the car the plaintiff was riding in. It does not render officers liable for all consequences of their volitional movements, a point that *Fisher* explicitly made when it distinguished hostage-rescue cases from the one before it: a hostage, unlike the passenger of a car that a police officer aims to stop, is not the intended target of the rescuer's force. *Fisher*, 234 F.3d at 317 n.3. Arthur ignores *Fisher*'s recognition that only intended targets can raise Fourth Amendment claims. Her reliance on language detached from the opinion's broader sweep is unavailing.

Nor does Arthur's case comport with the canine cases, in which the intent to seize anyone restrained by an uncontrollable instrumentality is imputed to the officers who set that instrumentality into motion. VanderWeele and Wemple controlled their own bodily movements, and when they became aware that the force they exerted on Krause was in some way being transmitted to Arthur, they immediately ceased applying it. That makes this case much more like *Dunigan v. Noble*, in which the momentarily uncontrolled behavior of a police canine did not subject the dog's handler to liability, 390 F.3d 486, 492–93 (6th Cir. 2004), than the cases holding that officers intend to seize anyone a police canine bites because officers know that canines are inherently uncontrollable.

Arthur's last-ditch argument suggests that Defendants' "show of authority" of bursting into Majerczyk's room and marching toward Krause "restrained" her "liberty" because she was unable to leave the room and avoid contact with Defendants. (Resp. 22.) Arthur's argument is foreclosed by *Ewolski*, which squarely held that restrictions on the freedom of movement of a hostage-taker that amount to their seizure do not result in the seizure of the hostages who also perceive the

16

officers' display of authority. *Ewolski* turns on the idea that a reasonable person in the hostages' position would recognize that the officers intended to liberate them, not seize them. Nothing about the officers' conduct would have led a rational hostage to believe that *their* freedom of movement was restricted or that their escape, should they have been able to accomplish it on their own, would have been contrary to police directives.

The same is true in this case. Arthur was only pretending to be a hostage. She had no reason to think that Defendants' forceful entry into Majerczyk's office was intended to overawe her into submitting to their authority, because she knew that the authority they were exercising was make-believe. Arthur can point to no word, look, or gesture by Defendants that would have led a reasonable person in her shoes to conclude that she was not free to evade Defendants' charge. To the extent that Defendants limited the space within which Arthur could maneuver, they did so solely by occupying that space themselves, not by taking any physical steps to keep Arthur inside the room or prevent her from leaving. Again, the strongest evidence of this fact is that the moment Arthur expressed pain from pressure pinning her against the chair, that pressure was immediately lifted. (Arthur Dep. 40–41.) The only support for the contention that she was without room to maneuver is a generic reference to the memoranda of Rushford's internal investigation that Defendants submitted in an exhibit to their summary judgment motion—an exhibit nearly five hundred pages long. (*See* Resp. 7.) That is insufficient for Arthur to meet her burden. Without evidence that Defendants intentionally restricted Arthur's freedom of movement or made it impossible for her to avoid the force they directed against Krause, Arthur cannot argue that she was seized by acquiring control over her person. Consequently, there is no basis in fact or law for the conclusion that Defendants intentionally targeted Arthur for seizure.

17

## IV.    CONCLUSION

Arthur's claim fails because there is no genuine dispute that she was not seized within the meaning of the Fourth Amendment.  Accordingly, Defendants have established that they are entitled to summary judgment.  Because the Court determines that no constitutional right of Arthur's has been violated, the Court need not address Defendants' argument that they are immune from suit because their conduct was not prohibited by clearly established law.

The Court will enter an order consistent with this Opinion.


Dated: November 25, 2025             /s/ Hala Y. Jarbou
                                     HALA Y. JARBOU
                                     CHIEF UNITED STATES DISTRICT JUDGE